08 CV 00496

Jeffrey S. Abraham (JA-2946)
Arthur J. Chen (AC-5233)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Fax: (212) 279-3655

**Plaintiff's Counsel**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GREGORY MAJOR, On Behalf of Himself
and All Others Similarly Situated,

                    Plaintiff,

        v.

MORGAN STANLEY, MORGAN
STANLEY & CO. INCORPORATED, THE
INVESTMENT COMMITTEE OF THE
MORGAN STANLEY 401 (K) PLAN, THE
PLAN ADMINISTRATOR, THE MORGAN
STANLEY GLOBAL DIRECTOR OF
HUMAN RESOURCES, JOHN J. MACK,
ROY J. BOSTOCK, ERSKINE B. BOWLES,
SIR HOWARD J. DAVIES, KAREN
JAMESLEY, C. ROBERT KIDDER,
DONALD T. NICOLAISEN, CHARLES H.
NOSKI, HUTHAM S. OLAYAN, CHARLES
E. PHILLIPS, JR., O. GRIFFITH SEXTON,
DR. LAURA D. TYSON, DR. KLAUS
ZUMWINKEL, and JOHN DOES 1-30,

                    Defendants.

---

Civil Action No.

RECEIVED
JAN 18 2008
U.S.D.C. S.D.N.Y.
CASHIERS

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974**

Plaintiff, a participant in the Morgan Stanley 401(k) Plan ("401(k) Plan") and the Morgan

Stanley Employee Stock Ownership Plan ("ESOP") (collectively, the "Plans") during the

proposed Class Period, on behalf of the Plans, himself, and all others similarly situated, alleges

as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this suit as a civil enforcement action under the Employee

Retirement Income Security Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§

1105, 1109 and 1132(a)(2), (3), for relief on behalf of the Plans.  The Plans are retirement plans

operated and established by Morgan Stanley as a benefit for its employees to permit tax-

advantaged savings for retirement and other long-term goals.  Morgan Stanley common stock

("Company stock") is one of the investments offered in the 401(k) Plan, and the only investment

offered in the ESOP.  According to the Company's Form 11-K filed with the U.S. Securities and

Exchange Commission ("SEC") on June 28, 2007 for the 401(k) Plan, in excess of $1.8 billion of

the 401(k) Plan's $3.3 billion or more in assets were invested in Morgan Stanley stock.

Likewise, according to the Company's Form 5500 filed with the U.S. Department of Treasury

and U.S. Department of Labor on July 12, 2006 for the ESOP, approximately $3 billion of the

ESOP's $3.1 billion or more in assets were invested in Morgan Stanley stock.  Indeed, the Plans

were heavily invested in Morgan Stanley stock at all times relevant to this action, as discussed

herein.

2.      Plaintiff Gregory Major is a current participant in the Plans during the class

period of December 19, 2006 through the present (the "Class Period").  During the Class Period,

his retirement portfolio included Morgan Stanley stock.

2

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to other participants and beneficiaries of the Plans during the Class Period in violation of ERISA, particularly with regard to the Plans' holdings of Morgan Stanley stock.

4.      Morgan Stanley & Co., Incorporated ("MS & Co.") is the sponsor of the 401(k) Plan. Morgan Stanley is the sponsor of the ESOP Plan. Mellon Bank, N.A. is the trustee for the Plans.

5.      Since the Plans' holdings in Morgan Stanley stock comprised a significant percentage of the overall value of the assets held by the Plans, the long-term retirement savings of the Plans' participants were dependent to a substantial degree both on the performance of Morgan Stanley stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of assets of the Plans. This action alleges that the fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, inter alia, selecting and maintaining Company stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plans.

6.      The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plans' investment in Morgan Stanley stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company stock.

7.      The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Morgan Stanley was engaging in risky and unsound business practices in connection with its investments in conduits, Collateralized Debt Obligations ("CDOs") and Structured Investment Vehicles ("SIVs"), which were heavily exposed to the subprime credit

market. These investment practices rendered Morgan Stanley stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plans' participants.

8.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants. Indeed, the Plans' participants have seen their retirement savings accounts devastated as Company stock plummeted from a high of approximately $90 per share near the beginning of the Class Period to a price of approximately $50 per share at the end of the Class Period. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these fiduciary breaches.

9.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

10.     Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain allegations made by Plaintiff are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company maintains its executive offices in this District. Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## THE PARTIES

### Plaintiff

14.    Plaintiff Gregory Major is a resident of Queens County, New York. He is a current participant in the Plans, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a), and was a participant in the Plans throughout the Class Period. During the Class Period, Plaintiff held Morgan Stanley stock in his individual 401(k) Plan and ESOP accounts.

### Corporate Defendants

15.    Defendant Morgan Stanley is a Delaware corporation with its principal place of business located at 1585 Broadway, New York, New York. Morgan Stanley is a financial services company that, through its subsidiaries and affiliates, provides investment banking, securities, investment management, and wealth management services to corporations, governments, financial institutions, and individuals worldwide. The Company has three segments: Institutional Securities, Global Wealth Management Group, and Asset Management.

The Institutional Securities segment includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate, and project finance; corporate lending; sales, trading, financing, and market-making activities in equity securities and related products, and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities. The Global Wealth Management Group segment provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services. The Asset Management segment provides asset management products and services in equity, fixed income, and alternative investments, which include private equity, infrastructure, real estate, fund of funds, and hedge funds to institutional and retail clients through proprietary and third-party retail distribution channels, intermediaries, and the company's institutional distribution channel. The Company was founded in 1935 and is headquartered in New York, New York.

16.    MS & Co. is a corporation organized and existing under the laws of the state of Delaware. MS & Co., a subsidiary of Morgan Stanley and part of its Global Wealth Management Group, provides its individual and business customers with brokerage and investment advice through products such as annuity, insurance, and credit vehicles. After merging Morgan Stanley DW into it in early 2007, MS & Co. has become Morgan Stanley's primary broker-dealer in the US. MS & Co. is headquartered in New York, New York.

17.    MS & Co. and Morgan Stanley and collectively referenced herein as "Morgan Stanley" or the "Company."

18.     Upon information and belief, Morgan Stanley at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO"). Morgan Stanley had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities. Morgan Stanley exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plans, management and disposition of the Plans' assets, and appointment and removal of fiduciaries through its management employees, Morgan Stanley's Board of Directors (the "Board"), Plan Administrator and/or Investment Committee (terms are defined herein).

19.     Upon information and belief, under the terms of the Plans, Morgan Stanley was given direct control and management over any aspect of the operation, or administration of the Plans that was not specifically delegated to the named fiduciaries under the Plans and upon information and belief, exercised this control. Upon information and belief, the Plans name Morgan Stanley as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16). Under ERISA, a plan administrator is inherently a fiduciary.

20.     As a matter of corporate law, Morgan Stanley is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Morgan Stanley.

21.     Upon information and belief, Morgan Stanley, together with its Board, exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA. In this regard Morgan Stanley, together with the Board, drafted and disseminated various documents and materials related to the Plans, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD. Based on the allegations contained herein, Morgan Stanley is a

7

fiduciary with respect to the Plans because it exercised discretionary authority or discretionary

responsibility in the administration of the Plans, exercised discretionary authority or control with

respect to the management of the Plans' assets, and exercised discretionary authority and control

with respect to the appointment of other Plan fiduciaries.

22.    **The Board**. Upon information and belief, the business and affairs of the

Company are managed under the direction of the Board, including with respect to the

Company's role as a fiduciary of the Plans. One of the many roles or functions of the Board is

the power to appoint the members of the Investment Committee and Plan Administrator (as

defined below). Upon information and belief, the Board likewise exercised management or

control over the Investment Committee and Plan Administrator. Based on the above, the Board

is a fiduciary with respect to the Plans because it exercised discretionary authority or

discretionary responsibility in the administration of the Plans, exercised discretionary authority

or control with respect to the management of the Plans' assets, and exercised discretionary

authority and control with respect to the appointment of other Plans' fiduciaries.

(a)    **The Compensation, Management Development Committee.** The Board

operates through three key standing committees: (i) Audit; (ii) Compensation, Management

Development and Succession ("Compensation Committee"); and (iii) Nominating and

Governance. Upon information and belief, the Compensation Committee had overall

responsibility for the Plans. According to its Charter, the Compensation Committee shall

"[a]dminister and amend, as it determines appropriate, any present or future [ ] employee benefit

plan providing that it shall be administered or amended by the Board or the [Compensation]

Committee." Moreover, the Charter provides that the Compensation Committee has the duty to

"[c]reate and amend, as it determines appropriate, any trusts (including existing trusts) related to

any present or future [ ] employee benefit plan providing that it shall be administered or amended by the Board of Directors or the [Compensation] Committee. The [Compensation] Committee is also authorized to exercise and perform any power, authority, discretion or duty of the Board or the Committee that any such trust provides shall be exercised or performed by the Board or the [Compensation] Committee."

23.     *The Investment Committee*. Upon information and belief, the Plans assigned fiduciary responsibilities to the Investment Committee. Upon information and belief, the Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds. Upon information and belief, members of the Investment Committee are appointed by the Board. Upon information and belief, the Investment Committee is a "Named Fiduciary" under Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Upon information and belief, among the powers afforded to the Investment Committee is the ability to direct the investment of the Plans' assets, including buying or selling Company stock. Upon information and belief, the Investment Committee has the power to add or remove certain investment options under the Plans. Upon information and belief, the Investment Committee also has the power to appoint an investment manager for the Plans. Based on the above, the Investment Committee is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other fiduciaries of the Plans.

24.     *The Plan Administrator.* The Plans assigned fiduciary responsibilities to the Plan Administrator (the "Plan Administrator"). The Plan Administrator is a "Named Fiduciary" under

the Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Under the terms of the Plans, the general administration of the Plans shall be placed in the Plan Administrator. Upon information and belief, the Plan Administrator has such powers as may be necessary to carry out the provisions of the Plans, including the power and discretion to determine all benefits and resolve all questions pertaining to the administration, interpretation, and application of Plan provisions. Upon information and belief, the Plan Administrator and its members are appointed by the Compensation Committee. Under the terms of the Plans, the Plan Administrator is Morgan Stanley's Global Director of Human Resources or his or her delegate.

**Individual Defendants**

25.     Defendant John J. Mack ("Mack") served as Morgan Stanley's Chief Executive Officer and Chairman of the Board during the Class Period. He has served in that role since June 2005. Mack was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plans.

26.     Defendant Roy J. Bostock ("Bostock") was a member of the Board during the Class Period. He has been a Director since September 2005. During the Class Period, Bostock served as a member of the Nominating and Governance Committee.

27.     Defendant Erskine B. Bowles ("Bowles") was a member of the Board during the Class Period. He has been a Director since December 2005. During the Class Period, Bowles served as a member of the Compensation Committee.

28.     Defendant Sir Howard J. Davies ("Davies") was a member of the Board during the Class Period. He has been a Director since 2004. During the Class Period, Davies served as a member of the Audit Committee.

29.    Defendant Karen Jamesley ("Jamesley") was the Global Director of Human. Resources during the Class Period.

30.    Defendant C. Robert Kidder ("Kidder") was a member of the Board during the Class Period. Kidder has been a Director since 1993. During the Class Period, Kidder was the Lead Director of the Board, and Chairman of the Compensation Committee.

31.    Defendant Donald T. Nicolaisen ("Nicolaisen") was a member of the Board during the Class Period. He was a Director since April 2006. During the Class Period, Nicolaisen was a member of the Audit Committee and the Compensation Committee.

32.    Defendant Charles H. Noski ("Noski") was a member of the Board during the Class Period. Noski was a Director since September 2005. During the Class Period, Noski was Chairman of the Audit Committee.

33.    Defendant Hutham S. Olayan ("Olayan") was a member of the Board during the Class Period. She was a Director since April 2006. During the Class Period, Olayan served as a member of the Nominating and Governance Committee.

34.    Defendant Charles E. Phillips, R. ("Phillips") was a member of the Board during the Class Period. He served as a Director since June 2006. During the Class Period, Phillips served as a member of the Audit Committee.

35.    Defendant O. Griffith Sexton ("Sexton") was a member of the Board during the Class Period. He was a Director since September 2005.

36.    Defendant Dr. Laura D. Tyson ("Tyson") was a member of the Board during the Class Period. She was a Director since 1997. During the Class Period, Tyson served as Chair of the Nominating and Governance Committee.

37.    Defendant Dr. Klaus Zumwinkel ("Zumwinkel") was a member of the Board during the Class Period. He served as a Director since February 2004. During the Class Period, Zumwinkel was a member of the Nominating and Governance Committee.

38.    The defendants identified in ¶¶ 25 through 37 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plans within the meaning of ERISA.

39.    *The Board Defendants.* Morgan Stanley, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plans and ERISA as specified in ¶ 22 of this Complaint and therefore each member of the Board is a fiduciary for the reason stated in ¶ 22.

40.    In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 22, engaged in the conduct and had the powers and duties alleged in ¶ 22, and was, therefore, a fiduciary for the reasons set forth in ¶ 22.

41.    The individuals who served on the Board and acted as fiduciaries with respect to the Plans during the Class Period are as follows: Defendants Mack, Bostock, Bowles, Davies, Kidder, Nicolaisen, Noski, Olayan, Phillips, Sexton, Tyson, and Zumwinkel (collectively, the "Board Defendants").

42.    *The Management Defendants.* Morgan Stanley as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Morgan Stanley relied and continues to rely directly on various high-level corporate officers and employees to carry out its fiduciary responsibilities under the Plans and ERISA. Upon information and belief, during the Class Period, based on their high-level capacity and role

within the Company relating to administration of the Plans, each Defendant listed in this paragraph carried out the Company's role as a fiduciary as specified in ¶¶ 18-21 as well as influenced, managed and controlled the Company in its role as a Plan fiduciary. The following individuals are therefore fiduciaries for the reasons set forth in ¶¶ 18-21: Defendant Mack (the "Management Defendants"). Morgan Stanley and the Management Defendants listed in this paragraph shall collectively be referred to as the "Morgan Stanley Defendants."

43.    Plaintiff does not yet know the identity of all the individual Management Defendants during the Class Period. Therefore, some of the Management Defendants are named fictitiously, as Defendants Does 1 to 10. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

44.    *The Investment Committee Defendants*. Upon information and belief, during the Class Period each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 23, engaged in the conduct and had the power and duties alleged in ¶ 23 and was therefore a fiduciary for the reasons set forth in ¶ 23.

45.    Plaintiff does not currently know the identity of the Investment Committee Defendants during the Class Period. Therefore, the members of the Investment Committee Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

46.    *The Plan Administrator Defendants*. During the Class Period the Global Director of Human Resources, Karen Jamesley, carried out the Plan Administrator's role as a fiduciary with respect to the Plans as set forth in ¶ 24, engaged in the conduct and had the power and duties alleged in ¶ 24) and was therefore a fiduciary for the reasons set forth in ¶ 24.

47.    Plaintiff does not currently know the identity of all the Plan Administrator Defendants during the Class Period.  Therefore, the members of the Plan Administrator Defendants are named fictitiously, as Defendants Does 21 to 30.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

48.    The Investment Committee Defendants and the Plan Administrator Defendants are collectively referred to herein as the "Committee Defendants."  The Investment Committee and the Plan Administrator Committee are collectively referred to herein as the "Committee."

## NATURE OF THE PLANS

### The 401(k) Plan

49.    The 401(k) Plan is a defined contribution 401(k) plan that commenced activities on September 1, 1970, and covers eligible employees of Morgan Stanley and certain participating companies.  Morgan Stanley encourages its eligible employees to become active participants in the 401(k) Plan and save for their financial future.  According to the SPD for the 401(k) Plan, the 401(k) Plan is a convenient way for employees to save for retirement through tax-deferred contributions from their pay.  Full-time, flex part-time, regular part-time employees of participating companies are eligible to participate in the 401(k) Plan upon hire.

50.    All eligible participants may elect to make pre-tax contributions of 1% to 20% of annual earnings subject to Internal Revenue Code limits of $15,000 per year in 2006.  Those participants attaining age 50 during the year may elect a pre-tax catch-up contribution of 1% to 20% of eligible earnings, subject to Code limits of $5,000 per year in 2006.

51.    Participants direct the investment of their contributions into various investment options offered by the 401(k) Plan.  One of the investment options during the Class Period was a Company Stock Fund.

52.    To be eligible for a Company match for a year, an employee must participate in
the 401(k) Plan by making pre-tax contributions in that year and must be employed by the
Company on December 31 of that year.  Upon information and belief, during the Class Period,
all Company contributions were made to the ESOP.  Company contributions are allocated in
Morgan Stanley common stock under the ESOP.

53.    All employees of the Company newly hired on or after January 1, 2004, are
vested in any Company contributions upon the earlier of: (i) completing three years of credited
service, or (ii) terminating employment due to death, total and permanent disability, retirement or
release as defined by the 401(k) Plan.

54.    Individual accounts are maintained for each of the Plans' participants.  Each
participant account is credited with the participant's contributions, allocations of the Company's
contribution and the Plans' earnings, and charged with an allocation of the Plans' losses and
administrative expenses not otherwise paid by the Company.

55.    All of the 401(k) Plan's investments are held in a trust account at Mellon Bank,
N.A.  The Morgan Stanley Defined Contribution Master Trust ("Master Trust") includes
commingled assets of the 401(k) Plan and the ESOP.  Quarterly transfers are made from the
Morgan Stanley Stock Fund under the 401(k) Plan to the ESOP to provide participants with an
opportunity to elect to receive cash payments of the dividends paid on the Morgan Stanley Stock
Fund.

56.    Upon information and belief, the portion of the 401(k) Plan that is invested in the
Morgan Stanley Stock Fund, including the portions that are thereafter transferred to the ESOP,
do not qualify as an employee stock ownership plan under the numerous requirements set forth
in both ERISA and the Internal Revenue Code.  Upon information and belief, the 401(k) Plan's

Summary Plan Description is silent with regard to the 401(k) Plan's purported status as an employee stock ownership plan.

57.    Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any of the 401(k) Plan be invested in the Morgan Stanley Stock Fund. The requirement was simply that if a portion of the 401(k) Plan were invested in the Morgan Stanley Stock Fund, that portion would be transferred to the ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported employee stock ownership plan status did not, in fact, require the investment in the Morgan Stanley Stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Morgan Stanley Stock Fund.

58.    Similarly, the 401(k) Plan could have held one share of Morgan Stanley common stock and still been an employee stock ownership plan since that "portion" of the 401(k) Plan -- the one share -- would have been primarily invested in Morgan Stanley common stock.

59.    Finally, even if the portion of the 401(k) Plan invested in the Morgan Stanley Stock Fund constituted an employee stock ownership plan, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an employee stock ownership plan, the 401(k) Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duties to act loyally, prudently and honestly.

60.    Upon information and belief, Morgan Stanley incorporates by reference into the SPDs for the Plans, certain information filed with the SEC, including but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, and Registration Statements.

61.     The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the 401(k) Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

62.     An employee benefit plan, such as the 401(k) Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

63.     The assets of an employee benefit 401(k) Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the 401(k) Plan were held in trust by Mellon Bank, N.A.

64.     ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The 401(k) Plan filed a Form 5500 in July 2006.

65.     Upon information and belief, Morgan Stanley stock represented a significant portion of the total invested assets of the Plans throughout the Class Period.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plans, whose individual accounts included investments in Morgan Stanley stock during the Class Period of December 1, 2005 through the present. Excluded from the Class are Defendants, members of the Defendants'

immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

67.   This action is properly maintainable as a class action because:

    (a)   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

    (b)   Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plans suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plans and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

    (c)   Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

    (d)   A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class,

which would then establish incompatible standards of conduct for
Defendants. As the damages suffered by the individual Class members,
direct or indirect through their participation in the Plans may be relatively
small, the expense and burden of individual litigation make it virtually
impossible for the Class members individually to redress the wrongs done
to them and/or the Plan. The likelihood of individual Class members
prosecuting separate claims is remote. Furthermore, Defendants' conduct
affected and affects all Class members in a similar manner, making
declaratory and injunctive relief to the Class as a whole appropriate.

68.     The questions of law and fact common to the members of the Class predominate
over any questions affecting individual members of the Class. The questions of law and fact that
are common to Plaintiff and the Class include, among others:

(a)     Whether ERISA applies to the claims at issue;

(b)     Whether Defendants owe and owed fiduciary duties to the members of the
Class;

(c)     The nature of the fiduciary duties Defendants owe or owed to members of
the Class;

(d)     Whether Defendants breached their fiduciary duties; and

(e)     The extent of losses sustained by the Plans, and thereby members of the
Class, and the appropriate measure of relief.

69.     Plaintiff anticipates no unusual difficulties in the management of this action as a
class action.

## DEFENDANTS' FIDUCIARY STATUS

70.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plans' assets.

71.    During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

72.    **Named Fiduciaries**.  ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).  Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plans.  In addition, the Morgan Stanley Defendants are Named Fiduciaries since they were appointed the Plans' Administrator.

73.    **De Facto Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Morgan Stanley).  ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan."  During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in ¶¶ 97-128.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

74.    ERISA is a comprehensive statute covering virtually all aspects of an employee

benefit plan, including retirement savings plans, such as the Plans. The goal of ERISA is to

protect the interests of the Plans' participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect
> interstate commerce and the interests of participants in employee
> benefit Plan and their beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit Plan, and by providing for appropriate remedies, sanctions,
> and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

75.    Under ERISA, those responsible for employee benefit plan management stand in

a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly

to include all persons or entities that are able to exercise discretionary authority over the

management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires

strict fidelity and loyalty in the execution of the plan's management.

76.    ERISA imposes on Defendants, who are responsible for the Plans, the

requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the

participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims." ERISA

§ 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

77.    ERISA also imposes on Defendants responsible for the Plans a duty of loyalty,

requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the

interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . .

providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

78.　　Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plans' assets, include but are not limited to:

> (a)　　The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;
>
> (b)　　The duty to evaluate all investment decisions with "an eye single" to the interests of Plans' participants and beneficiaries;
>
> (c)　　The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;
>
> (d)　　To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named which includes, among other things: (1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, (2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties, (3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; (4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and (5) the duty to remove a fiduciary if that

fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)     The duty to disclose and inform the Plans' Participants of any material adverse information about the Plans that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plans' participants concerning any aspect of the Plans including its investments; (2) an affirmative duty to inform the Plans' participants about material adverse factors that were affecting the Plans or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)     A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price that renders it improbable that the investments will bring a fair return commensurate with the prevailing rates;

(g)     A duty to diversify the Plans' investments to minimize the risk of large losses to the Plans and its participants; and

(h)     The duty to not blindly follow plan documents if doing so leads to an imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on the language of plan documents.

79.     ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

80.     Insofar as the Plans were not properly diversified funds and therefore more risky to the Plans' participants, the Defendants had heightened fiduciary duties to the Plans' participants with respect to the Plans' investment in Morgan Stanley stock, including heightened duties to disclose all material information relevant to investments in Morgan Stanley stock.

81.     A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a co-fiduciary if:

(a)     the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing such act or omission is a breach; or

(b)     if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104 (a)(1) in the administration of his specific responsibilities that gives rise to fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

(c)     the fiduciary knew or should have known of a breach by such other fiduciary and does not make reasonable efforts under the circumstances to remedy the breach.

**MORGAN STANLEY STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN**

**Background of the Subprime Lending Industry**

82.     Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentations or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

83.     Because subprime borrowers are seen as "higher risk," their loans carry interest rates that are at least 2 percentage points higher than those offered to borrowers with better credit. So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the same mortgage would cost a subprime customer 7% interest or more.

84.     The subprime market has grown rapidly in recent years. In 1994, fewer than 5% of mortgage originations in the United States were subprime, but by 2005 about 20% of mortgage originations were subprime. The greater access to subprime mortgages has helped homeownership grow.

85.     Subprime mortgages totaled $600 billion last year, accounting for about one-fifth of the U.S. home loan market. An estimate of $1.3 trillion in subprime mortgages are currently outstanding.

86.     The rapid growth of the subprime lending industry has been attributed to a number of factors that occurred in 2004 and 2005. These factors include rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

87.     The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while

simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

88.      From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

89.      Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan. Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from 10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable-rate mortgage and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28

and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

90.    Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

91.    In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

92.    In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers

with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

93.    Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit. Because of the rapid expansion of subprime lending in recent years, lenders, investors, and ratings agencies had limited data with which to model credit risk posed by new borrowers or novel mortgage types, and so may have underestimated the risk involved. Several lenders have already been forced out of the subprime market, in part because of the wave of early payment defaults on mortgages they originated.

94.    Instead of holding mortgage loans generally, lenders sell subprime mortgages that are bundled into bonds and offer them to individual and institutional investors.

95.    In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

96.    Throughout the fall of 2007, the stock prices of many large lenders dropped significantly as a result of problems with the subprime mortgage industry. Having invested hundreds of millions of dollars in securities backed by subprime mortgages which had become nearly worthless, these lenders were forced to announce substantial mortgage related charges.

**Morgan Stanley's Participation in the Subprime Market**

97.     Morgan Stanley, the nation's second largest investment bank, is one of the many investment banks that jumped on the bandwagon and began underwriting pools of securities tied to subprime mortgages in late 2005.

98.     These pools of securities are called collateralized debt obligations or CDOs ("CDOs"). A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages.

99.     In the summer of 2005, Defendant Mack became Morgan Stanley's Chief Executive Officer and instituted a policy of putting more of Morgan Stanley's capital at risk in exchange for the possibility of garnering greater returns. Starting in late 2005, Morgan Stanley began the practice of dramatically increasing its exposure to credit assets that had little or no price transparency, making it difficult for the Plans' Participants and the market to determine the risks associated with investing in these assets. "After his return to the firm more than two years ago, Defendant Mack spoke publicly of adopting a higher risk profile and pushed the firm into in-vogue investment areas like subprime mortgages, lending to private equity firms and using more of the firm's own capital to take big trading positions. The strategy produced substantial profits for a time, but also resulted in a complex and ultimately disastrous trade in collateralized debt obligations. . . ." Landon Thomas, Jr. *Morgan Stanley Executive Ousted After Trading Loss*, N.Y. Times, Nov. 30, 2007, at C1.

100.    In furtherance of Defendant Mack's determination to take more risk with the Company's capital, and despite the impending subprime crisis, Morgan Stanley acquired Saxon Capital, Inc., ("Saxon") a servicer and originator of residential mortgages, for $706 million.

101.    The acquisition of Saxon was reported in Morgan Stanley's 2006 Annual Report, filed on February 16, 2006, and was intended to provide Morgan Stanley with access to subprime

mortgages that could be repackaged into complex investment vehicles. In a press release issued by the Company on December 4, 2006, this acquisition was touted as "another important step in our long-term strategy of building a global, vertically integrated residential mortgage business . . . . Saxon adds a premier servicing operation with a scalable U.S. origination platform to our substantial existing residential mortgage franchise."

102.    In addition to acquiring Saxon, Morgan Stanley took enormous positions in super-senior segments of CDOs throughout the Class Period. Upon information and belief, at the start of 2007, Morgan Stanley held approximately $13 billion worth of super-senior CDOs in order to hedge and finance its bearish subprime bet. These CDOs paid a higher interest rate than the Company's cost of financing, generating large profits until the subprime meltdown in October after more modest declines in August and September. The bearish subprime bet, which took the form of derivatives called swaps, required Morgan Stanley to pay interest on those contracts. To off-set the bearish subprime bet and help generate interest income to pay off the cost of the swaps, the Company amassed the CDO position attributable to most of the losses that were announced in November 2007.

103.    Despite the fact that Morgan Stanley was able to anticipate the losses from its exposure to subprime mortgage investments as far back as 2006, it failed to take any action to protect the Plans' participants from these foreseeable losses. Indeed, the Company has a risk management panel who is responsible for overseeing these types of credit issue. Nevertheless, that panel and the Board failed to disclose its findings to the Plans' participants while the Plans continued to invest in the Company Stock Fund.

104.    Upon information and belief, Morgan Stanley also failed to adequately disclose contingent liabilities associated with Conduits and SIVs. Conduits and SIVs (structured

investment vehicles) are investment vehicles that banks use to issue commercial paper. Until recently, they were considered to be highly rated, short-term notes that offered investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

105.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate at which they borrow money and the rate at which they lend money.

106.    The vehicles are often established in a tax haven and are run solely for investment purposes, as opposed to typical corporate activities.

107.    It is difficult for investors to assess the financial risks imposed by SIVs or conduits because they are off-the-balance-sheet entities.

108.    Morgan Stanley represented to money market fund managers and other investors that SIVs were safe investments that use the proceeds from the issuance of commercial paper and short-term notes to invest strictly in high-quality debt securities.

109.    Investors, including money market funds, have pulled back from debt sold by SIVs because of their exposure to subprime mortgage securities. Because SIVs still owe money to commercial-paper holders, and cannot raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debt.

110.    Morgan Stanley's conduits are on the brink of collapse, subjecting the Company to billions of dollars of liability as a result of investor lawsuits for causing conduits to issue debt based on materially false and misleading statements.

111.    In addition, Morgan Stanley may end up having to move its conduits onto its balance sheets, thereby causing it to recognize billions of dollars in potential liability that it had not adequately disclosed to investors and the Plans' Participants.

### Morgan Stanley Failed to Disclose Material Adverse Information Concerning Its Subprime Assets to the Plans' Participants and Failed to Provide the Plans' Participants with Complete and Accurate Information Regarding Its Loan Loss Exposure

112.    Throughout the Class Period Defendants issued false and misleading statements and omitted material information regarding Morgan Stanley to Plan participants concerning, among other things, Morgan Stanley's exposure to subprime credit, off-balance sheet entities, CDOs and other credit-specific problems, which caused the Company's total fourth quarter 2007 writedown owing to U.S. subprime exposure to be approximately $9.4 billion.

113.    On December 19, 2006, Morgan Stanley reported record income for the fourth quarter and full year 2006, reporting a 51% increase in net income from the previous year and net revenues for the fourth quarter of $8.6 billion, 24% above last year's fourth quarter. Defendant Mack touted these results, stating "2006 was a year of outstanding progress for Morgan Stanley. Capitalizing in a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history."

114.    ·Morgan Stanley's earnings for the first quarter of 2007 were similarly impressive. The Company reported net revenues up 29% from the first quarter of the previous year and a record net income of $2.672 million, an increase of 70% from the first quarter of the previous year. Commenting on these positive results Defendant Mack stated, "This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses."

115.    After announcing these results the Company's Executive Vice President and

Chief Financial Officer David Sidwell addressed issues relating to the subprime market on an

investor conference call stating that "**While there has been considerable media coverage**

**regarding higher delinquencies in the subprime mortgage industry, we have not seen any**

**impact on our Card portfolio.  Nevertheless, we continue to monitor the situation closely.**"[1]

116.    On June 15, 2007, Morgan Stanley Stock hit a 52-week high of $90.05.

117.    On June 20, 2007, Morgan Stanley announced more stellar results for the second

quarter which ended May 31, 2007,  reporting record income from continuing operations of

$2.582 million, an increase of 41% from the second quarter of 2006, and net revenues of a record

$11.5 billion, 32% above the second quarter from the previous year.

118.    Defendant Mack touted these earnings and painted a rosy picture of the

Company's future, stating:

> Morgan Stanley delivered record revenues and earnings in the
> second quarter and the first half of the year, as we continue to build
> momentum across our securities businesses and continued to see
> the benefits of our diverse mix of products, clients and businesses
> around the globe.  Thanks to the commitment and focus of our
> people, we've not achieved seven straight quarters with ROE
> above 20 percent, and we're all on our way to reaching our goal of
> doubling 2005 earnings over five years.  But we believe there is
> still work that remains to be done, and we remain intensely focused
> on delivering value to Morgan Stanley's clients and shareholders
> over the long term.

119.    Following the announcement of Morgan Stanley's second quarter results,

Defendant Sidwell addressed Morgan Stanley's concerns with the subprime market on a June 20,

2007 conference call reassuringly stating:

---

[1]  On May 1, 2007, Morgan Stanley issued a press release announcing the retirement of Mr. Sidwell as CFO and
stating that Thomas Colm Kelleher would replace him.

As you've seen from our press release, we achieved record net
revenues, profit before tax, in come and earnings per share from
continuing operations.

We are very pleased with these results, as they reflect execution of
our strategic growth plans and string trading performance. . . .
*Concerns early in quarter about, whether issues in the Subprime
market were going to spread dissipated.* . . .

120.    Thus in the wake of an uproar of concerns regarding the collapse of the subprime

market, Morgan Stanley continued to assure the market and the Plans' Participants of the

continued viability of Morgan Stanley Stock and of the fact that the Company would remain

unscathed by the subprime crisis, despite the Plans' heavy investment in Company stock.

### The Truth Emerges

121.    On September 19, 2007, Morgan Stanley announced disappointing results for the

third quarter ended August 31, 2007, reporting that income from continuing operations for the

quarter had decreased 7% compared to the third quarter of the prior year.

122.    On November 7, 2007, Morgan Stanley issued a press release "announcing

significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures

as a result of the continued deterioration in the market. . . ." The Company recorded a $3.7

billion writedown, after which its stock fell 6.1% to $51.19.

123.    On November 21, 2007, Morgan Stanley stock hit a 52-week low closing at

$47.56 per share.

124.    As a result of this, Morgan Stanley co-president Zoe Cruz was terminated:

"Morgan Stanley, its reputation battered over a recent $3.7 billion loss linked to subprime

mortgages, has become the latest Wall Street firm to force the retirement of a senior banking

executive . . . . The move represents a sharp reversal for John Mack, the chief executive, who

had supported and cultivated the career of Cruz. . . ." *Subprime woes claim Morgan Stanley career*, International Herald Tribune, Dec. 1, 2007, at 14.

125.    More bad news for the Company followed. On December 19, 2007, Morgan Stanley announced that it was taking an additional $5.7 billion mortgage-related write-down, resulting in a total write down related to mortgages of *$9.4 billion*. One analyst called this news "a 'complete breakdown' in the company's risk-management." David Ellis, *More Woes for Morgan Stanley*, CNNMoney.com, Dec. 20, 2007.

126.    Morgan Stanley also suffered its first quarterly loss ever as it reported Fourth Quarter results. The Company reported a loss of $3.6 billion versus a profit of $2.0 billion from the prior year.

127.    Following these dismal results, S&P downgraded Morgan Stanley and placed its rating on Morgan Stanley on "CreditWatch," commenting that "'MS' dismal fourth-quarter results heighten our concern regarding its strategic direction and risk appetite." *S&P: Morgan Stanley 'AA-/A-1+' Ratings Put On CreditWatch*, Market News Publishing, Dec.19, 2007.

128.    On December 22, 2007, The Financial Times reported that Morgan Stanley was reviewing the position of chief risk officer Tom Daula: "A person close to Colm Kelleher, Morgan Stanley's chief financial officer, said the bank was 'evaluating the risk function, including the top of that function' and looking at switching the reporting lines for risk management to Mr. Kelleher. . . . The decision on Mr. Daula's future will shed light on whether the blame for the losses is seen to lie with people monitoring the risk or with more senior executives." Henry Sender, *Morgan Stanley reviews position of risk officer over writedowns*, Financial Times, Dec. 22, 2007, at 15. The article further states that "Mr. Daula's supporters within the bank say his repeated warnings were ignored." *Id.*

## CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

129.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and

loyally manage the Plans' assets because, during the Class Period, Defendants knew or should

have known that Company stock was not a prudent investment for the Plans and knew or should

have known that the value of Company stock was exposed to an unacceptable risk of loss.

130.    Defendants' knowledge that the Company stock was an imprudent investment is

based on the fact that Defendants knew or should have known of the unsound business practices

and risky lending activities and other misrepresentations alleged herein. Defendants failed to

take adequate steps to prevent the Plans, and indirectly the participants, from suffering losses as

a result of the Plans' investments in Company stock.

131.    Upon information and belief, not one of the Defendants conducted an appropriate

investigation into whether Company stock was a prudent investment for the Plans in light of the

Company's risky exposure to the subprime credit market and other related serious corporate

misconduct and given the fact that the Plans held enormous investments in Company stock.

Moreover, not one of the Defendants provided the Plans' participants with information regarding

the true nature of these business practices and the extraordinary risks that they presented to

Morgan Stanley such that the Plans' participants could make informed decisions regarding the

Company stock in the Plans. Indeed, not one of the Defendants took any meaningful action to

protect the Plans against the risk of enormous losses as a result of the Company's very risky and

inappropriate corporate misconduct.

132.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in

Company stock imposes a greater risk than that of other undiversified investments.

133.    The risk associated with the investment in Company stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk could not have been known by the Plans' participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

134.    Participants, even before placing any retirement savings in Company stock, relied on the stability and financial viability of Morgan Stanley as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Morgan Stanley's continued solvency and viability.

135.    Thus, one of the risks that could impair the participant's investment in Company stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and participants in the Plans. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company stock as well as the duty to inform participants concerning the imprudence of investing in Company stock.

136.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Morgan Stanley stock was a prudent investment for the Plans; failed to develop appropriate investment guidelines for Morgan Stanley stock; failed to divest the Plans of Morgan Stanley stock; failed to discontinue further contributions of Morgan Stanley stock to the Plans; failed to remove Morgan Stanley stock as an investment option for the

Plans; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Morgan Stanley stock; and failed to resign as fiduciaries of the Plans if as a result of their employment by Morgan Stanley they could not loyally serve the Plans and their participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Morgan Stanley stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company stock even though they knew or should have known that Morgan Stanley would be taking billions of dollars in losses to remedy its risky exposure to the subprime credit market, resulting in a decrease in the value of Morgan Stanley stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

137.    Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Morgan Stanley's investment practices, Morgan Stanley's earnings, and Morgan Stanley's profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Morgan Stanley's Annual Report, and the Plan's annual report on SEC Forms 11-K. In addition, the foregoing documents omitted, and continue to omit, material information concerning Morgan Stanley's financial performance, including Morgan Stanley's risky exposure to the subprime credit market. No Defendant took any action to remedy the breaches set forth in this paragraph.

138.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) and ESOP industry and trade press:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend not to change their investment option allocations in the plan once made;

(c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

139.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Morgan Stanley stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

140.    Based on their actual or constructive knowledge as set forth in ¶¶ 112-120, Defendants knew about Morgan Stanley's exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPDs. Defendants knew that the Plans' participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plans' participants would be harmed by this lack of knowledge. Defendants on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plans' participants the true nature, extent, and risks of

these problems. Rather, Defendants failed to timely communicate accurate information to the Plans' participants concerning Morgan Stanley's true financial condition, including its unsound business practices in prior periods, when they knew or should have known that the Plans' participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plans' participants with complete and accurate information regarding Morgan Stanley stock, such that the participants could appreciate the true risks presented by investments in Morgan Stanley stock and could make informed decisions, thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Morgan Stanley stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

141.    The Morgan Stanley Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The Morgan Stanley Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Morgan Stanley Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plans and ERISA; ensure that they had adequate information to do their job of overseeing the Plans' investments; ensure that they adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

### DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

142.    Morgan Stanley's SEC filings make clear that a significant percentage of Morgan Stanley's officer and director compensation is in the form of stock grants or stock option grants.

143.    Because the compensation of many of the Defendants was significantly tied to the price of Morgan Stanley stock, Defendants had an incentive to keep the Plans' assets heavily invested in Morgan Stanley stock on a regular, ongoing basis. Elimination of Company stock as an investment option would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in lower compensation for the Defendants.

144.    Moreover, keeping the Plans' assets heavily invested in Morgan Stanley stock allowed Defendants to sell their personally held Morgan Stanley stock at artificially inflated prices.

145.    This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Company stock when they became aware of the Company's risky exposure to the subprime credit market; they did *not*, however, divest the Plans' investment in Morgan Stanley stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

146.    Some Defendants may have had no choice in tying their compensation to Morgan Stanley stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Company stock.

147.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## CAUSATION

148.   The Plans suffered massive losses because a substantial amount of the Plans'
assets were imprudently invested by the Plans in Morgan Stanley stock during the Class Period,
and in breach of Defendants' fiduciary duties.

149.   Had Defendants properly discharged their fiduciary duties, including the
provision of full and accurate disclosure of material facts concerning Morgan Stanley stock and
divesting the Plans from Company stock offered by the Plans when such investment became
imprudent, the Plans would have avoided losses suffered in Company stock.

150.   As a result of Defendants' actions, Plaintiffs and the Class, which invested in
Morgan Stanley stock through the Plans, were wrongfully damaged, as the Plans suffered
substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described
herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they
would have taken steps to eliminate or reduce the amount of Morgan Stanley stock held by the
Plans, eliminated the option for participants to place funds in Morgan Stanley stock, or fully
disclosed the material adverse facts concerning Morgan Stanley stock described herein.
Plaintiffs and the Class are entitled to the best alternative investment available to them under the
circumstances, and the Plans would have achieved gains and avoided losses but for Defendants'
breach of fiduciary duty as described herein.

151.   The Plans and the Plans' fiduciaries do not qualify for any affirmative defense
based on ERISA Section 404(c) as the Plans did not satisfy the numerous stringent requirements
of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth
in 29 C.F.R. § 2550.404c-1.  This is because Defendants, among other ERISA § 404(c)
disclosure failures, failed to ensure effective participant control by providing complete and
accurate material information to participants regarding Company stock. *See* 29 C.F.R. §

2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Company stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

152.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

153.    The losses suffered by the Plans and the Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Morgan Stanley's risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

### REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

154.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the

Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

155.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

156.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

157.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## Count I

### Failure to Prudently Manage the Plans' Assets;
### Breach of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

158.    Plaintiff incorporates the foregoing paragraphs herein by reference.

159.    The Plans are governed by the provisions of ERISA, 29 U.S.C. § 1001, et. seq.,
and Plaintiffs and the Class are participants and/or beneficiaries in the Plans. The Defendants are
all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §
1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and
prudence.

160.    Defendants named in this Count were each responsible, in different ways and
degrees, for the Plans' investments in Company stock.

161.    Under ERISA, fiduciaries who exercise discretionary authority or control over the
management of a plan or disposition of a plan's assets are responsible for ensuring that
investment options made available to plan participants are prudent. Furthermore, such
fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

162.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest
and to resolve them promptly when they occur. A fiduciary must always administer a plan with
single-minded devotion to the interests of the participants and beneficiaries, regardless of the
interests of the fiduciaries themselves or the plan sponsor.

163.    Defendants named in this Count were responsible for ensuring that investment in
Company stock was prudent and consistent with the purpose of the Plans. Defendants are liable
for any and all losses incurred as a result of such investments being imprudent.

164.    During the Class Period, the Defendants named in this Count knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein irrespective of any duty of diversification that may exist.  Notwithstanding this knowledge, these Defendants offered and continued to offer Company stock as investment options for the Plans and/or offered and continued to offer to direct and approve the investment in Company stock.

165.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investments in Company stock.  The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Company stock and that continued investment in Company stock was not in keeping with the Plans' settlors' expectation on how a prudent fiduciary would operate.

166.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky lending practices and other misrepresentations that impacted Company stock as alleged in this Complaint.  Despite this knowledge, they participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing the Plans' participants that Company stock was not a prudent investment.

167.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to

develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of

Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed

to remove Company stock as investment options of the Plans; (f) failed to both consult or appoint

independent fiduciaries regarding the appropriateness of an investment in Company stock;

(g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts

and circumstances that made Company stock an unsuitable and imprudent investment for the

Plans; and (h) failed to resign as fiduciaries of the Plans if, as a result of their employment by

Morgan Stanley or its affiliates, they could not loyally serve the Plans and their participants. In

addition, these Defendants breached their fiduciary duty when they failed to prohibit any

participant in the Plans from making an "investment switch" into Company stock.

168.    As a result of the breach of fiduciary duties of the Defendants named in this

Count, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries,

suffered damages, the exact amount of which will be determined at trial.

169.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to

the Plans caused by their breach of fiduciary duty as alleged in this Count.

### Count II

### Failure to Provide Complete and Accurate Information
to Participants and Beneficiaries;
Breaches of Fiduciary Duties in Violation of ERISA § 404
(Against All Defendants)

170.    Plaintiff incorporates the foregoing paragraphs herein by reference.

171.    At all relevant times herein, Defendants were fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

47

172.    During the Class Period, Defendants knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans.

173.    As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plans.

174.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plans.

175.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to Plans' participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plans, including Company stock.

176.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

177.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain

48

from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including the Company stock.

178.    Because a substantial percentage of the Plans' assets were invested in Company stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company stock.

179.    Because of the disparity in knowledge between Defendants and the Plans' participants, the participants relied on Defendants to provide them with accurate and complete information about Morgan Stanley, which was material to the suitability of Company stock as a prudent investment option.

180.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

181.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Morgan Stanley's risky exposure to the subprime credit market as detailed in this Complaint.

182. The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Morgan Stanley's serious mismanagement, including Morgan Stanley's risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Company stock and the prudence of investing retirement contributions in Company stock.

183. All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Company stock. All Defendants knew or should have known that Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Company stock; knew or should have known that the Plans' participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Company stock were made to Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or the Plans' participants the true nature, extent, and risks of investing in Company stock when they knew or should have know that investment in Company stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to Plan participants concerning Morgan Stanley's risky exposure to the subprime credit market during the Class Period when they knew or should have known that Plans' participants needed this information.

184. As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and

proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly

Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

185.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), the Defendants are personally liable to the Plans for these losses incurred as a

result of Defendants' misrepresentations to the Plans' participants as well as their breach of the

fiduciary duty to disclose and inform.

## Count III

### Failure in Appointing and Monitoring Plan Fiduciaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against the Board Defendants and the Morgan Stanley Defendants)

186.    Plaintiff incorporates the foregoing paragraphs herein by reference.

187.    At all relevant times herein, Defendants were fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

188.    At all relevant times herein, the fiduciary duties of the Board Defendants and

Management Defendants included the power and responsibility to appoint, and the duty to

oversee and thereby monitor the performance of the Committee.

189.    At all relevant times herein, the scope of the fiduciary duties of the Board

Defendants and Morgan Stanley Defendants included the oversight and the power and

responsibility to appoint, and thereby monitor the performance of the Committee.

190.    During the Class Period, Defendants knew or should have known that Company

stock was not a suitable, prudent or appropriate investment for the Plans, as described herein.

191.    Under ERISA, a fiduciary with appointment powers must ensure that the

appointed fiduciaries are performing their fiduciary obligations, including those obligations with

respect to handling, holding and investing plan assets; and must take prompt and effective action

to protect the plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

192.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants; or (2) deciding whether to retain or remove their appointees.

193.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the plan and the fiduciaries' investment decisions regarding the plan.

194.    The Board Defendants and Morgan Stanley Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage its assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of unsound business practices and risky lending activities and other misrepresentations concerning Company stock as alleged herein) understood the true extent of Morgan Stanley's unsound business practices and risky lending

activities and its impact on the value of Company stock and the Plan's concomitant investment in Company stock.

195.    The Board Defendants and the Morgan Stanley Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate. The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options for the Plans; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to prohibit any participant from making an "investment switch" into Company stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable or imprudent investment for the Plans; and (i) failed to inform Plan participants that investment in Company stock would not be prudent.

196.    As a consequence of the Board Defendants' and the Morgan Stanley Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plans would have been averted or, at a minimum, lessened. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

197.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

198.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants and Morgan Stanley Defendants are personally liable to restore the losses to the Plans caused by their failure to monitor and remove fiduciaries as alleged in this Count.

### Count IV

#### Co-Fiduciary Liability;
#### Breaches of Fiduciary Duties in Violation of ERISA § 405
#### (Against all Defendants)

199.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

200.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

201.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

202.    During the Class Period, Defendants knew that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein.

Failure to Remedy

203.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

204.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint. Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company stock, as well as other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to the Plans' participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

205.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company stock and other fiduciary

breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Company stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

206.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, these Defendants breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform Plan participants regarding the imprudence of investing in Company stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

Enabling a Breach

207. ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

208. To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plans' investment in Company stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Company stock. In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

209. Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Company stock in the Plans.

210. Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants imprudent management of Company stock in the Plans.

211. The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

212.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

213.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

### Count V

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Individual Defendants)

214.    Plaintiff incorporates the foregoing paragraphs herein by reference.

215.    At all relevant times, as alleged above, the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

216.    ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

217.    These Defendants were heavily invested in Morgan Stanley stock and had an interest in ensuring that the Plans' assets were also heavily invested in Morgan Stanley stock on a regular, ongoing basis.  Elimination of Company stock as an investment option for the Plans would have reduced the overall market demand for Morgan Stanley stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Morgan Stanley stock, resulting in losses for the Defendants named in this Count.

218.    The Defendants named in this Count placed their own interest in investing the Plans' assets in Morgan Stanley stock over the Plans' participants' interest in maintaining a diversified and prudently invested ERISA plan.

219.    The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage an independent fiduciary who could make independent judgments concerning the Plans' investment in Morgan Stanley stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plans' participants above the interests of themselves and the Company with respect to the Plans' investment in Morgan Stanley stock.

220.    As a result of these Defendants' breach of their duty to avoid conflicts of interest, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

221.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.    Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.    Compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.    Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.    Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Morgan Stanley stock;

G.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.    Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.    Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.    Awarding such other relief as this Court may deem just and proper.

Dated: January 18, 2008

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

Jeffrey S. Abraham (JA-2946)
Arthur Chen (AC-5233)
One Penn Plaza, Suite 2805
New York, New York 10119
(212) 279-5050 (telephone)
(212) 279-3655 (facsimile)
jabraham@aftlaw.com
achen@aftlaw.com

***Attorneys for Plaintiff***

61